## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 24-CR-60186-DSL

**UNITED STATES OF AMERICA**

v.

**JOSHUA WEINSTEIN,**

      **Defendant.**

_____/

### AGREED FACTUAL BASIS FOR GUILTY PLEA

Joshua Weinstein ("Defendant") hereby acknowledges that, if this case were to go to trial, the United States would establish the following facts beyond a reasonable doubt:

From in or around June 2017, and continuing through in or around early September 2019, in the Southern District of Florida, the Southern District of Texas, and elsewhere, Defendant did knowingly and willfully combine, conspire, confederate, and agree with Keisha Harris, and others, to distribute and dispense controlled substances, including oxycodone and hydrocodone to Creative Care Pharmacy, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(C).

Defendant held the title of President of Wholesaler C, a distributor of pharmaceutical opioids and other controlled and non-controlled drugs, that was headquartered in Miami, Florida. Wholesaler C's owners were Person A and Person B. Defendant was a salaried employee that did not share in the profits of the company or earn a commission on sales.

In or around early 2017, Defendant was approached by independent pharmaceutical sales representative Chad Atkinson about a business prospect that Atkinson said would generate large

1

profits for Wholesaler C. At the time, Atkinson was a sales representative at a purported pharmaceutical consulting company, Proven Rx Sales, LLC ("Proven"), where Atkinson had established a network of Houston-area independent pharmacies willing to pay well over-market prices for certain controlled drugs, in certain strengths—specifically, hydrocodone 10-325 mg, oxycodone 30 mg, and hydromorphone 8 mg (collectively, the "Commonly Abused Opioids"); and alprazolam 2 mg, carisoprodol 350 mg, and promethazine with codeine syrup (collectively, the "Potentiators," for their reputation on the black market as enhancers of the high illicit users sought from the Commonly Abused Opioids) (collectively, the Commonly Abused Opioids and Potentiators are the "Commonly Abused Prescription Drugs").

Defendant introduced the owners of Wholesaler C—Persons A and B—to Atkinson. Wholesaler C retained Atkinson as a contractor. Because Atkinson's book of business was primarily in Houston, his contract facilitated sales to Atkinson's Houston-area pharmacy customers of the Commonly Abused Prescription Drugs and certain non-controlled drugs that Wholesaler C required the Houston-area pharmacies to purchase in a ratio of four non-controlled-drug pills for every Commonly Abused Prescription Drug pill.

Defendant became responsible for Wholesaler C's account for Houston-area pharmacy Creative Care in around June 2017, which Defendant serviced directly until Creative Care's owner, Keisha Harris, was arrested for illegally selling Commonly Abused Opioids on or about August 28, 2019.

Early in the course of handling the Creative Care account, Defendant suspected that Creative Care was a pill-mill pharmacy—that Harris was dispensing the Commonly Abused Pharmaceutical Drugs she bought from Wholesaler C outside the usual course of professional

2

practice, without a legitimate medical purpose. Defendant's suspicions were based on red flags for diversion, including:

- Creative Care pharmacy's location in the Houston-area "hot zone";
- Harris being interested in purchasing as many of the Commonly Abused Prescription Drugs as she could get from Wholesaler C;
- Harris's lack of concern for the non-controlled drugs Wholesaler C required her to purchase in order to order her limits of Commonly Abused Prescription Drugs;
- Harris's interest in brands and colors of the Commonly Abused Opioids, which legitimate pharmacy customers rarely exhibited; and
- Harris's willingness to pay well-over-market rates to acquire both the Commonly Abused Prescription Drugs, *and* the non-controlled drugs required to meet Wholesaler C's ratios—the payment of which Defendant understood would have been untenable without profits driven by the black market.

Notwithstanding those red flags and his suspicions, Defendant for a time remained deliberately ignorant and helped Harris *increase* her purchasing limits for the Commonly Abused Prescription Drugs, including by emailing her language to send back to him requesting a large increase, to create the (false) impression that Harris had drafted the request. Defendant then forwarded Harris's email containing the language to Person C, who then conveyed the request to Person B. Person B partially approved the increase.

In other instances, Defendant picked for Harris the non-controlled drugs she needed to purchase to meet Wholesaler C's required controlled-to-non-controlled-drug purchasing ratio. Defendant suspected based on Harris's ambivalence that Harris was not really selling the non-controlled drugs (or, if she was, she was doing mainly to maintain the appearance of legitimacy, and not for any real medical purpose).

In around March 2019, Defendant, Atkinson, and Person A traveled to Houston and visited Creative Care. The pharmacy was in a strip mall; there were metal bars on the outside-facing doors and windows; and there was nothing in the single-room customer area except for a few chairs and two small windows for "pick up/drop off" and "consultation." This was also consistent with

3

Defendant's assumption that Harris was diverting the Commonly Abused Prescription Drugs she bought from Wholesaler C.

In late August 2019, Defendant and others at Wholesaler C became aware of a press release issued by the U.S. Department of Justice reflecting that Harris, as "pharmacist-in-charge and owner of Creative Care Pharmacy of Houston, Texas," was charged criminally "for her alleged participation in a scheme to unlawfully distribute and dispense controlled substance[s] without a legitimate medical purpose." In early September 2019, Defendant received an email from Harris stating, "Creative Care is no longer, keep me in your prayers."

All told, Defendant facilitated Harris's purchase from Wholesaler C of approximately 110,500 hydrocodone 10-325 mg pills and approximately 10,000 oxycodone 30 mg pills, which Defendant knew and intended Harris would and did dispense outside the course of professional practice, without a legitimate medical purpose.

*The preceding statement is a summary, made for the purpose of providing the Court a factual basis for my guilty plea to the charges against me. It does not include all the facts known to me concerning the criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.*

Date: 10/2/24

By: _____
JOSHUA WEINSTEIN
Defendant

Date: 10/2/24

By: _____
DAVID OSCAR MARKUS + LAUREN KRASNOFF
Counsel for Defendant

Date: 10/2/24

By: _____
DREW PENNEBAKER
Trial Attorney, U.S. Department of Justice

4